IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| Al-Oshan v. Bush | ) | Case No.  05-CV-0533 (RJL) |
| Al-Sharekh v. Bush | ) | Case No.  05-CV-0583 (RJL) |
| Hamoodah v. Bush | ) | Case No.  05-CV-795 (RJL) |
| Khan v. Bush | ) | Case No.  05-CV-1010 (RJL) |
| Rimi v. Bush | ) | Case No.  05-CV-2427 (RJL) |
| Nasser v. Bush | ) | Case No.  06-CV-1676 (RJL) |
| Ismatullah v. Bush | ) | Case No. 06-CV-1682 (RJL) |

_____

**STATUS REPORT IN RESPONSE TO COURT'S JULY 3, 2008 ORDER**

Pursuant to the Court's July 3, 2008 Order, respondents hereby submit the following status report with respect to the above-captioned Guantanamo Bay habeas corpus cases:

1.    The petitioners in the above-captioned cases are no longer detained at Guantanamo Bay.  The United States has relinquished custody of petitioners and transferred them to the custody of other governments, consistent with the policies and practices pertaining to such transfers as outlined in the attached declarations of Ambassador Clint Williamson and Deputy Assistant Secretary of Defense for Detainee Affairs Sandra Hodgkinson.

2.    In light of petitioners' release from United States custody, the above-captioned habeas cases should be dismissed as moot.[1]

---

[1] Two of the above-captioned cases were dismissed previously.  *See Nasser v. Bush*, 06-CV-1676 (RJL) (dkt. no. 3) (notice of voluntarily dismissal pursuant to Fed. R. Civ. P. 41(a)(1)); *Ismatullah v. Bush*, Case No. 06-CV-1682 (RJL) (dkt. no. 12) (final judgment dismissing case).

Dated: July 14, 2008                    Respectfully submitted,

                                        GREGORY G. KATSAS
                                        Assistant Attorney General

                                        DOUGLAS N. LETTER
                                        Terrorism Litigation Counsel

                                        ___ /s/ Andrew I. Warden _____
                                        JOSEPH H. HUNT (D.C. Bar No. 431134)
                                        VINCENT M. GARVEY (D.C. Bar No. 127191)
                                        JUDRY L. SUBAR (D.C. Bar 347518)
                                        TERRY M. HENRY
                                        ANDREW I. WARDEN (IN Bar 23840-49)
                                        Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave., N.W.
                                        Washington, DC  20530
                                        Tel:  (202) 616-5084
                                        Fax:  (202) 616-8470

                                        Attorneys for Respondents

# EXHIBIT  1

<u>DECLARATION OF SANDRA L. HODGKINSON</u>

I, Sandra L. Hodgkinson, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.      I am the Deputy Assistant Secretary of Defense for Detainee Affairs in the Department of Defense ("DoD").  My office is organized under the office of the Under Secretary of Defense for Policy.  The Office of Detainee Affairs, which I supervise, is responsible for providing policy advice to the Under Secretary of Defense on matters regarding detainees in DoD control.  I have served in this position since July 9, 2007. The statements in paragraphs 5 through 8 of this Declaration provide a general overview of the process of transferring detainees in DoD control at the United States Naval Base at Guantanamo Bay, Cuba ("GTMO"), to the control of a foreign government.  These statements are not intended to be an exhaustive description of all of the steps that might be undertaken in particular cases, but rather they reflect United States policy and practices with respect to transfers of detainees from GTMO.   I make this declaration based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2.  One of DoD's current missions is to use all necessary and appropriate force to defeat the al Qaeda terrorist network and its supporters.  In the course of that campaign – which remains ongoing – the United States and its allies have captured thousands of individuals overseas, virtually all of whom are foreign nationals.  Through a screening and evaluation process, DoD determines whether the individuals should be detained during the conflict as enemy combatants.  As of July 2, 2008, approximately 265 foreign nationals are being held by DoD at GTMO.

3.  It is lawful and appropriate for DoD to detain enemy combatants as long as hostilities are ongoing.  Nonetheless, DoD has no interest in detaining enemy combatants longer than necessary.  Accordingly, DoD conducts regular reviews of GTMO detainees who have been determined to be enemy combatants but have not been referred to military commission or previously cleared for transfer or release to determine whether continued detention is warranted based on factors such as whether the detainee continues to pose a threat to the United States and its allies.  Where continued detention is deemed no longer necessary, a detainee may be transferred to the control of another government for release.  Furthermore, the United States also transfers GTMO detainees, under appropriate circumstances, to the control of other governments when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not continue to pose a threat to the United States and its allies.  Once transferred, detainees may be subject to detention, investigation, and/or prosecution if appropriate under the receiving country's laws.  Such governments can include the government of a detainee's home country, or a country other than the detainee's home country, including a country that may have a law enforcement, prosecution, or other interest in the detainee.

4.  Since 2002, approximately 500 detainees have departed Guantanamo for other countries including Albania, Algeria, Afghanistan, Australia, Bangladesh, Bahrain, Belgium, Denmark, Egypt, France, Germany, Iran, Iraq, Jordan, Kuwait, Libya, Maldives, Mauritania, Morocco, Pakistan, Russia, Saudi Arabia, Spain, Sweden, Sudan, Tajikistan, Tunisia, Turkey, Uganda, the United Kingdom, and Yemen.

5.  When the DoD transfers GTMO detainees to the control of other governments, the DoD does so after dialogue with the receiving government.  Such dialogue may be initiated by the receiving government or may be initiated by the United States.  Unless a transfer is to be a transfer for release, a purpose of the dialogue is to ascertain or establish what measures the receiving government intends to take pursuant to its own domestic laws and independent

determinations that will ensure that the detainee will not pose a continuing threat to the United

States and its allies.  In all cases of transfer, the detainee is transferred entirely to the custody and

control of the other government, and once transferred, is no longer in the custody and control of

the United States; the individual is detained, if at all, by the foreign government pursuant to its

own laws and not on behalf of the United States.  When detainees are transferred to the custody

or control of their home governments, it is frequently the case that the home government takes

the detainee into its custody, at least for an initial period.  In some cases, the home government

has subsequently released the detainee, sometimes after a period of questioning or investigation,

while in other cases, the detainees have remained in confinement or subject to other restrictions

in their home countries for various reasons based on the determinations and laws of the home

government.  Of the GTMO detainees who have been transferred by the DoD to the control of

their home countries, most have subsequently been released from detention.

6.  Once a DoD transfer of a GTMO detainee is proposed, the views of interested United

States Government agencies are considered.  For such a transfer, it is the policy of the United

States, consistent with the approach taken by the United States in implementing the Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, not to

repatriate or transfer individuals to other countries where it believes it is more likely than not that

they will be tortured.   Therefore, if a transfer is deemed appropriate, a process is undertaken,

involving the Department of State, in which appropriate assurances regarding the detainee's

treatment are sought from the country to whom the transfer of the detainee is proposed.   The

Declaration of Clint Williamson dated July 7, 2008, accurately and completely describes that

process to the best of my knowledge and belief.

7. The ultimate decision to transfer a detainee to the control of another government is made with the involvement of senior United States Government officials. The Secretary of Defense or his designee ultimately approves transfers. Decisions on transfers are made on a case-by-case basis, taking into account the particular circumstances of the transfer, the country, and the detainee concerned, as well as any assurances received from the receiving government. If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved. Circumstances have arisen in the past where the Department of Defense elected not to transfer detainees to their country of origin because of torture concerns.

8.     The Executive Branch is best situated to make decisions regarding transfers of detainees, as noted in the Declaration of Clint Williamson. Requiring the United States to disclose information unilaterally about proposed transfers and negotiations outside of appropriate executive branch agencies could adversely affect the relationship of the United States with other countries and impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts, including with respect to our joint efforts in the war on terrorism. Judicial review, including the possible overturning of decisions to transfer and delays in transfers occasioned by review and possible appeals, could lead to similar harm.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on July 9, 2008.

Sandra L. Hodgkinson

**EXHIBIT  2**

## DECLARATION OF CLINT WILLIAMSON

I, Clint Williamson, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I am the Ambassador-at-Large for War Crimes Issues and have supervised the operation of the Department of State Office of War Crimes Issues (S/WCI) since July 10, 2006. In that capacity I advise the Secretary of State directly and formulate U.S. policy responses to serious violations of international humanitarian law committed in areas of conflict throughout the world.  As the President's envoy, I travel worldwide and engage foreign government leaders and international organizations to build bilateral and international support for U.S. policies related to accountability for atrocities committed in armed conflicts and other violations of international humanitarian law.  Following September 11, 2001, S/WCI was assigned the additional role of maintaining a diplomatic dialogue with foreign governments whose nationals have been captured in connection with the armed conflict with the Taliban and al Qaeda and who are detained at the U.S. Naval Base at Guantanamo Bay, Cuba. The following statements provide a general overview of the Department of State role in carrying out United States policy with respect to the transfer to foreign governments of detainees held by the Department of Defense at Guantanamo Bay and the process that is followed to ensure that any international obligations and United States policies are properly implemented. These statements are not intended to be an exhaustive description of all of the steps that might be undertaken in any particular case, but do reflect United States policy and practices with respect to transfers from Guantanamo. I make these statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The United States has no interest in detaining enemy combatants longer than necessary.  While acting in accordance with the President's stated objective of moving toward

2

the day when we can eventually close the detention facility at Guantanamo Bay, the U.S.
Government's paramount goal is to ensure, to the maximum extent reasonably possible, that
transferring a detainee out of U.S. Government control prior to the cessation of hostilities will
not increase the risk of further attacks on the United States or its allies. The Secretary of
Defense, or his designee, is generally responsible for approving the transfer of detainees from
Department of Defense control at Guantanamo Bay to other governments either for release or for
possible detention, investigation, prosecution or other control measures, as appropriate. On an
ongoing basis, the Department of Defense reviews the continued detention of each individual it
holds at Guantanamo Bay Naval Base, Cuba. Since 2002, approximately 500 detainees have
departed Guantanamo for other countries including Albania, Afghanistan, Algeria, Australia,
Bangladesh, Bahrain, Belgium, Denmark, Egypt, France, Germany, Iran, Iraq, Jordan, Kuwait,
Libya, Maldives, Mauritania, Morocco, Pakistan, Russia, Saudi Arabia, Spain, Sweden, Sudan,
Tajikistan, Tunisia, Uganda, the United Kingdom, and Yemen.

     3. The Department of Defense consults with appropriate United States Government
agencies, including the Department of State, before determining whether to transfer particular
individuals. Detainees have been transferred for release when it was determined that they do not
meet the criteria of enemy combatants or no longer pose a continuing threat to the U.S. security
interests. Detainees have been transferred to the control of their governments of nationality for
possible detention, investigation, prosecution or control, as appropriate, when those governments
were willing to accept responsibility for ensuring, consistent with their laws, that the detainees
will not continue to pose a threat to the United States and its allies. A detainee may be
considered for transfer to a country other than his country of nationality, such as in

3

circumstances where that country requests transfer of the detainee for purposes of criminal prosecution or in situations where humane treatment concerns prevent the transfer of the detainee to his country of nationality.

4. Of particular concern to the Department of State in making recommendations on transfers is the question of whether the foreign government concerned will treat the detainee humanely, in a manner consistent with its international obligations, and will not persecute the individual on the basis of his race, religion, nationality, membership in a social group, or political opinion. The Department is particularly mindful of the longstanding policy of the United States not to transfer a person to a country if it determines that it is more likely than not that the person will be tortured or, in appropriate cases, that the person has a well-founded fear of persecution and would not be disqualified from persecution protection on criminal- or security-related grounds. This policy is consistent with the approach taken by the United States in implementing the Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment and the Protocol Relating to the Status of Refugees. The Department of State works closely with the Department of Defense and relevant agencies to advise on the likelihood of persecution or torture in a given country and the adequacy and credibility of assurances obtained from a particular foreign government prior to any transfer.

5. The Department of State generally has responsibility to communicate on transfer-related matters as between the United States and foreign governments. The Department of State receives requests from foreign governments for the transfer of detainees and forwards such requests to the Department of Defense for coordination with appropriate Departments and agencies of the United States Government. The Department of State also communicates

4

requests from the United States to foreign governments to accept the transfer of their nationals.
In cases where approved detainees cannot be transferred to their countries of nationality because
of humane treatment concerns, the Department of State communicates with foreign
governments to explore third-country resettlement possibilities. More than 60 countries have
been approached to date with respect to various detainees who fall within this category, and the
only country where the U.S. Government has had success in resettling detainees with no prior
legal ties to that country is Albania.

      6. Once the Department of Defense has approved a transfer from Guantanamo Bay and
requests the assistance of the Department of State, my office would facilitate transfer discussions
with the foreign government concerned or, where repatriation is not an available option because
of humane treatment concerns or for other reasons, with third countries where resettlement might
be appropriate. The primary purpose of these discussions is to learn what measures the receiving
government is likely to take to ensure that the detainee will not pose a continuing threat to the
United States or its allies and to obtain appropriate transfer assurances. My office seeks
assurances that the United States Government considers necessary and appropriate for the
country in question. Among the assurances sought in every transfer case in which continued
detention or other security measures by the government concerned are foreseen is the assurance
of humane treatment and treatment in accordance with the international obligations of the foreign
government accepting transfer. The Department of State considers whether the State in question
is party to the relevant treaties, such as the Convention Against Torture and Other Cruel,
Inhuman or Degrading Treatment or Punishment, and ensures that assurances are tailored
accordingly if the State concerned is not a party or other circumstances warrant.

5

7.  Decisions with respect to Guantanamo detainees are made on a case-by-case basis,

taking into account the particular circumstances of the transfer, the country, the individual

concerned, and any concerns regarding torture or persecution that may arise.

Recommendations by the Department of State are decided at senior levels through a process

involving Department officials most familiar with international legal standards and obligations

and the conditions in the countries concerned. Within the Department of State, my office,

together with the Office of the Legal Adviser, the Bureau of Democracy, Human Rights, and

Labor, and the relevant regional bureau, normally evaluate foreign government assurances in

light of the circumstances of the individual concerned, and, if deemed appropriate, brief the

Secretary or other Department Principals before finalizing the position of the Department of

State.  The views of the Bureau of Democracy, Human Rights, and Labor, which drafts the U.S.

Government's annual Human Rights Reports,[1] and of the relevant regional bureau, country desk,

or U.S. Embassy are important in evaluating foreign government assurances and any individual

fear of persecution or torture claims, because they are knowledgeable about matters such as

human rights, prison conditions, and prisoners' access to counsel, in general and as they may

apply to a particular case in the foreign country concerned, as well as particular information

about the entity or individual that is offering the assurance in any particular case and relevant

background about any allegations of mistreatment that may have surfaced in connection with

past transfers to the country in question.

---

[1] The Human Rights Reports are the official State Department reports to Congress on human rights conditions in individual countries for a given year as mandated by law (sections 116(d) and 502(b) of the Foreign Assistance Act of 1961, as amended, and section 505(c) of the Trade Act of 1974, as amended).

6

8.  The essential question in evaluating foreign government assurances relating to humane

treatment is whether, taking into account these assurances and the totality of other relevant

factors relating to the individual and the government in question, the competent Department of

State officials believe it is more likely than not that the individual will be tortured in the country

to which he is being transferred.  In determining whether it is "more likely than not" that an

individual would be tortured, the United States takes into account the treatment the individual is

likely to receive upon transfer, including, *inter alia,* the expressed commitments of officials

from the foreign government accepting transfer.   When evaluating the adequacy of any

assurances, Department officials consider the identity, position, or other information concerning

the official relaying the assurances, and political or legal developments in the foreign country

concerned that would provide context for the assurances provided.  Department officials may

also consider U.S. diplomatic relations with the country concerned when evaluating assurances.

For instance, Department officials may make a judgment regarding foreign government's

incentives and capacities to fulfill its assurances to the United States, including the importance to

the government concerned of maintaining good relations and cooperation with the United States.

In an appropriate case, the Department of State may also consider seeking the foreign

government's assurance of access by governmental or non-governmental entities in the country

concerned to monitor the condition of an individual returned to that country, or of U.S.

Government access to the individual for such purposes.  In instances in which the United States

transfers an individual subject to assurances, it would pursue any credible report and take

appropriate action if it had reason to believe that those assurances would not be, or had not been,

honored.  In an instance in which specific concerns about the treatment an individual may

7

receive cannot be resolved satisfactorily, we have in the past and would in the future recommend

against transfer, consistent with the United States policy.

9. The Department of State's ability to seek and obtain assurances from a foreign

government depends in part on the Department's ability to treat its dealings with the foreign

government with discretion. Consistent with the diplomatic sensitivities that surround the

Department's communications with foreign governments concerning allegations relating to

torture, the Department of State does not unilaterally make public the specific assurances or

other precautionary measures obtained in order to avoid the chilling effects of making such

discussions public and the possible damage to our ability to conduct foreign relations. Seeking

assurances may be seen as raising questions about the requesting State's institutions or

commitment to the rule of law, even in cases where the assurances are sought to highlight the

issue for the country concerned and satisfy the Department that the country is aware of the

concerns raised and is in a position to undertake a commitment of humane treatment of a

particular individual. There also may be circumstances where it may be important to protect

sources of information (such as sources within a foreign government) about a government's

willingness or capability to abide by assurances concerning humane treatment or relevant

international obligations.

10. If the Department were required to disclose outside appropriate Executive branch

channels its communications with a foreign government relating to particular mistreatment or

torture concerns, that government, as well as other governments, would likely be reluctant in the

future to communicate frankly with the United States concerning such issues. I know from

experience that the delicate diplomatic exchange that is often required in these contexts cannot

8

occur effectively except in a confidential setting. Later review in a public forum of the

Department's dealings with a particular foreign government regarding transfer matters would

seriously undermine our ability to investigate allegations of mistreatment or torture that come to

our attention and to reach acceptable accommodations with other governments to address those

important concerns.

11. The Department's recommendation concerning transfer relies heavily on the facts and

analyses provided by various offices within the Department, including its Embassies.

Confidentiality is often essential to ensure that the advice and analysis provided by these offices

are useful and informative for the decision-maker. If those offices are expected to provide candid

and useful assessments, they normally need to know that their reports will not later be publicly

disclosed or brought to the attention of officials and others in the foreign States with which they

deal on a regular basis. Such disclosure could chill important sources of information and could

interfere with the ability of our foreign relations personnel to interact effectively with foreign

State officials.

12. The Executive Branch, and in particular the Department of State, has the tools to

obtain and evaluate assurances of humane treatment, to make recommendations about whether

transfers can be made consistent with U.S. government policy on humane treatment, and where

appropriate to follow up with receiving governments on compliance with those assurances. The

Department of State has used these tools in the past to facilitate transfers in a responsible manner

that comports with the policies described herein. The judicial review of the diplomatic dialogue

between the U.S. Government and other governments concerning the terms of transfer, or of the

ultimate decision to effect a transfer to a given country, risks undermining the ability of the U.S

9

Government to speak with one voice on Guantanamo transfer issues. This is critical as we continue to seek a reduction in the number of detainees in the Guantanamo detention facility and move toward the day when the facility can be closed altogether.

I declare under the penalty of perjury that the foregoing is true and correct.


Executed on July 7, 2008.

Clint Williamson